The PEOPLE OF the STATE OF CALIFORNIA and the Public Utilities Commission of the State of California, Petitioners,

v.

CIVIL AERONAUTICS BOARD, Respondent,

Western Airlines, Inc., Texas International Airlines, Inc., Ralph Nader and the Aviation Consumer Action Project, United Air Lines, Inc., Hughes Air Corporation, d/b/a Hughes Airwest, Intervenors.

NATIONAL ASSOCIATION OF REGULATORY UTILITY COMMISSIONERS, Petitioner,

v.

CIVIL AERONAUTICS BOARD, Respondent,

Texas International Airlines, Inc., Western Airlines, Inc., Ralph Nader and the Aviation Consumer Action Project, United Air Lines, Inc., Trans World Airlines, Inc., Hughes Air Corporation, d/b/a Hughes Airwest, Intervenors.

TEXAS AERONAUTICS COMMISSION, Petitioner,

v.

CIVIL AERONAUTICS BOARD, Respondent,

Texas International Airlines, Inc., Western Airlines, Inc., Ralph Nader and the Aviation Consumer Action Project, Trans World Airlines, Inc., United Air Lines, Inc., Hughes Air Corporation, d/b/a Hughes Airwest, Intervenors.

Nos. 76–2117, 76–2123 and 76–2155.

United States Court of Appeals, District of Columbia Circuit.

Argued 17 Feb. 1978.

Decided 20 June 1978.

As Amended 6 July 1978.

Rufus G. Thayer, Jr., Tiburon, Cal., with whom J. Calvin Simpson, San Francisco, Cal., was on the brief, for petitioner in No. 76–2117. Also Richard D. Gravelle, San Francisco, Cal., entered an appearance for petitioner in No. 76–2117.

William R. Nusbaum, Washington, D. C., with whom Paul Rodgers, Washington, D. C., was on the brief, for petitioner in No. 76–2123.

John L. Hill, Atty. Gen. and John David Hughes, Asst. Atty. Gen., Austin, Tex., were on the brief, for petitioner in No. 76–2155.

Alan R. Demby, Atty., C. A. B., Washington, D. C., with whom James C. Schultz, Gen. Counsel and Jerome Nelson, Deputy Gen. Counsel, C. A. B., Glen M. Bendixsen, Associate Gen. Counsel and Robert L. Toomey, Atty., C. A. B., Washington, D. C., were on the brief for respondents.

Reuben B. Robertson, III, Washington, D. C., with whom Alan B. Morrison, Washington, D. C., was on the brief, for intervenor, Ralph Nader and the Aviation Consumer Action Project.

Michael A. Katz, Arnold T. Aikens and Peter D. Connally were on the brief, for intervenor United Air Lines.

Richard A. Fitzgerald, David L. Vaughan and John W. Simpson, Washington, D. C., were on the brief, for intervenor, Hughes Airwest.

Ralph B. Jordan and Dennis A. Barlow, Bakersfield, Cal., and Robert E. Moock, Visalia, Cal., were on the brief, for amicus curiae, City of Kern and City of Visalia.

Emory N. Ellis, Jr., Washington, D. C., entered an appearance for intervenors, Western Airlines and Texas International Airlines, Inc.

Edmund E. Harvey, Washington, D. C., entered an appearance for intervenor, Trans World Airlines, Inc., in No. 76–2123 only.

Robert B. Nicholson and James F. Ponsoldt, Atty., Dept. of Justice, Washington, D. C., entered appearances in Nos. 76–2123 and 76–2155.

Before WRIGHT, Chief Judge, and BAZELON and WILKEY, Circuit Judges.

Opinion for the Court filed by WILKEY, Circuit Judge.

WILKEY, Circuit Judge.

Presented for our review is an order of the Civil Aeronautics Board (Board) in which lawful fares were set for the transportation, by air carriers operating under Board certification, of interstate and intrastate passengers in the intra-California and intra-Texas markets. Dual economic regulation by federal and state agencies has produced a conflict. In a broader sense, our review concerns the authority granted the Board by statute and delegated to it by the Congress under the Commerce Clause, Article I, Section 8, Clause 3, of the United States Constitution.

## I. BACKGROUND

The Public Utilities Commission of the State of California (CPUC) and the Texas Aeronautics Commission (TAC) are state regulatory agencies which license intrastate air carriers. In California intrastate fares are set by PUC regulation, but in Texas competitive forces operate to establish the fare structure without state regulation at the present time. In both of these states fares have been in effect for intrastate air transportation which are lower than those set by the Board for interstate transportation.

Under the authority granted it by the Federal Aviation Act[1] the Board authorizes air carriers and regulates the fares they charge for air transportation in interstate carriage, as defined in §§ 1301(10) and (21)(a) of the Federal Aviation Act.[2] Interstate transportation includes carriage between two or more points within a state when it is part of a longer journey commencing from or destined to another state. It is obvious that air carriers transporting intrastate traffic between points in a single state also carry interstate traffic.

The term "interstate carrier," as used in this opinion, refers to a carrier holding a certificate of public convenience and necessity issued by the Board authorizing it to engage in interstate air transportation.

Recognizing that fare differences existed between interstate and intrastate passage in the California and Texas markets, the Board instituted a formal investigation[3] on 25 September 1972 to determine whether unjust discrimination resulted from the fares charged by interstate carriers in violation of the Federal Aviation Act providing:

property as a common carrier for compensation or hire . . . in commerce between, respectively—(a) a place in any State of the United States . . . and a place in any other State of the United States . . . .

---

**1.** 49 U.S.C. § 1301 *et seq.*

**2.** 49 U.S.C. § 1301(10):
'Air transportation' means interstate, overseas, or foreign air transportation or the transportation of mail by aircraft.
49 U.S.C. § 1301(21):
'Interstate air transportation' . . . mean[s] the carriage by aircraft of persons or

**3.** Docket 24779, Interstate and Intrastate Fares in California and Texas Markets.

No air carrier or foreign air carrier shall make, give, or cause any undue or unreasonable preference or advantage to any particular person, port, locality, or description of traffic in air transportation in any respect whatsoever or subject any particular person, port, locality, or description of traffic in air transportation to any unjust discrimination or any undue or unreasonable prejudice or disadvantage in any respect whatsoever.[4]

The Initial Decision of the ALJ found that there were discriminatory differences between the interstate and intrastate fares but viewed the discrimination as justified because of the need of the interstate carriers to compete with intrastate carriers in the local markets. The need to compete was caused by the revenue losses the interstate carriers would suffer otherwise. The conclusion reached in the Initial Decision was that the discrimination was not unjust.

The Board reversed the Initial Decision in determining that there were no significant differences in costs incurred and services rendered, that passengers were intermingled, and that knowledgeable interstate passengers, through "double ticketing," were paying the lower intrastate fares for travel which was actually interstate. In the opinion of the Board these factors amounted to unjust discrimination, because all passengers were not treated equally.

The Board concluded that only by eliminating the fare differentials could a remedy be achieved. It reasoned that while two levels of fares remained in effect, no proper safeguard could be found, as the intent of the passenger had to be revealed to the carrier to determine which level was authorized. The availability of lower fares would obviously create a reason for interstate passengers not to reveal their travel plans. Accordingly, the Board ordered interstate

carriers to charge fares at rate levels which have been established for operations throughout their domestic systems generally, such fares to be "constructed in accordance with the Board's prior decisions in the *Domestic Passenger-Fare Investigation,* Dockets 21866, et al.,[5] except that such fares may be lowered to the extent necessary to meet the competition from intrastate carriers."[6]

In taking this action the Board relied upon the Supreme Court's *Shreveport* decision[7] interpreting the then-existing Section 3 of the Interstate Commerce Act as conferring power on the Interstate Commerce Commission to regulate intrastate rates in order to eliminate unjust discrimination against interstate movements, 49 U.S.C. § 1374(b) of the Federal Aviation Act having been patterned after Section 3 of the Interstate Commerce Act.

The question before this court is whether the Board's order was in excess of its statutory authority, unsupported by substantial evidence, or arbitrary and capricious.[8]

## II. ANALYSIS OF ISSUES

### A. *Unjust Discrimination*

■ We must initially determine whether there was substantial evidence for a finding of unjust discrimination because of a dual fare level between interstate and intrastate passengers traveling on interstate carriers.[9]

It is clear from the record that all passengers received the same services, which were provided at the same costs, and that interstate and intrastate passengers were intermingled. It is also clear that some interstate passengers, who have been termed "knowledgeable" because they were aware of the dual fare structure, had made a practice of purchasing separately the intra-

---

4. 49 U.S.C. § 1374(b).

5. In this proceeding, which considered all aspects of interstate fares in the forty-eight contiguous states, the Board adopted principles by which interstate fares are established.

6. Board Opinion, Docket 24779, 8 July 1976.

7. *Houston, East & West Texas Railway Company v. United States,* 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341 (1914).

8. 5 U.S.C. § 706.

9. 49 U.S.C. § 1486(e).

state portion of their passage. The effect is that intrastate passengers and knowledgeable interstate passengers were traveling within California and Texas at lower fares than all other interstate passengers. On the basis of the record, there was substantial evidence upon which the Board could find unjust discrimination, and we uphold that finding.

### B. *Authority to Eliminate Unjust Discrimination*

■ We move next to the question of whether the Board exceeded its authority in establishing a single fare level applicable to both interstate and intrastate passengers traveling on interstate carriers.

Petitioners attack the Board decision by claiming that the Board has usurped the power of a state to control air commerce strictly within its borders and ousted the state agencies from economic regulation of intrastate fares. The argument runs that, in the absence of a specific grant of authority to the Board, a state is free to regulate commerce within its confines. The Board order has the effect of regulating intrastate fares, a right reserved to the state and one which the Federal Aviation Act does not grant to the Board. On certain noncompetitive, or monopoly, routes in California served only by *inter* state carriers, the *intra* state fares will be replaced with fares at the interstate level. Predictions are made of an adverse economic impact on the isolated communities served by monopoly routes, in that the higher cost of air travel will discourage passengers, effecting locality discrimination. With the termination of control by CPUC, the California passenger will lose the right to participate in determining the reasonableness of rates.

The Board asserts its authority to eliminate unjust discrimination by setting a single fare level is grounded in the Federal Aviation Act, *supra*, § 1374(b), and relies upon the Supreme Court's landmark decision in *Shreveport.*[10]

In *Shreveport* interstate carriers were applying freight rates established by a Texas state regulatory commission which were at a lower rate for eastbound and intrastate shipments than for westbound shipments from Shreveport, Louisiana, into Texas. The then-existing Section 3 of the Interstate Commerce Act[11] provided that it was unlawful for a common carrier to give undue preference to a particular locality. The Court held that Congress possesses the power to regulate and protect interstate commerce even though intrastate transactions may be controlled thereby. It went on to say:

> It is also clear that, in removing the injurious discriminations against interstate traffic arising from the relation of intrastate to interstate rates, Congress is not bound to reduce the latter below what it may deem to be a proper standard . . . .. Congress is entitled to maintain its own standard as to these rates, and to forbid any discriminatory action by interstate carriers which will obstruct the freedom of movement of interstate traffic . . . .. Having this power, Congress could provide for its execution through the aid of a subordinate body . . . .[12]

The *Shreveport* opinion concluded that although Section 1 provided that the Interstate Commerce Act did not extend to intrastate transportation, when unjust discrimination arises from the relation of intrastate to interstate rates, Congress is competent to deal with it.

The *Shreveport* doctrine has been followed consistently in the ensuing years; *Il-*

---

**10.** Note 7, *supra*.

**11.** Interstate Commerce Act Sec. 3:
That it shall be unlawful for any common carrier subject to the provisions of this act to make or give any undue or unreasonable preference or advantage to any particular person, company, firm, corporation or locality, or any particular description of traffic, in any respect whatsoever, or to subject any particular person, company, firm, corporation, or locality, or any particular description of traffic, to any undue or unreasonable prejudice or disadvantage in any respect whatsoever.

**12.** Note 7, *supra*, at 355, 34 S.Ct. at 838.

*linois Central R.R. Co. v. Public Utilities Commission,*[13] *Wickard v. Filburn,*[14] and courts have repeatedly held that Section 137(b) of the Federal Aviation Act was modeled after the Interstate Commerce Act, the latter being an appropriate guide for construing the former, *Transcontinental Bus System v. CAB.*[15] In addition, the legislative history of the Civil Aeronautics Act of 1938 indicates that Congress, although asked to do so, decided not to limit the application of the *Shreveport* doctrine in air transportation as it had done in highway transportation.

The provisions of the statutory schemes of the Interstate Commerce Act and Federal Aviation Act limit the federal agencies to the regulation of interstate commerce, but when unjust discrimination results from an intrastate rate structure, the federal power preempts that of the state.[16] The separation of interstate and intrastate passengers on interstate carriers was not possible in any practical manner.

The court upholds the Board's authority to eliminate unjust discrimination by set-

ting a single fare level to apply to both interstate and intrastate passengers on interstate carriers.

## C. The Remedy

█ Applying a single fare to all travelers, the Board eliminated the cause of the unjust discrimination. The petitioners contend that the application of the higher interstate rather than the lower intrastate fare was arbitrary, so we next examine the evidence and the rationale on which it was based.

The rate level set is particularly important in the monopoly markets of California, which, because they are served only by interstate carriers, will have an increased fare level.[17] Presumably the competitive forces on the other routes in California and on the Texas routes will operate to maintain a lower fare level, in accordance with the exception made in the Board's order.[18]

Cost evidence was not made a part of the proceeding before the Board, but the ALJ early in the proceeding ruled that basic costs would be determined by the principles

13. 245 U.S. 493, 38 S.Ct. 170, 62 L.Ed. 425 (1918).

14. 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942).

15. 383 F.2d 466, 480 (5th Cir. 1967), *cert. denied,* 390 U.S. 920, 88 S.Ct. 850, 19 L.Ed.2d 979 (1968). *See also Commonwealth of Virginia v. CAB,* 498 F.2d 129, 143 (4th Cir. 1974); *Flying Tiger Line v. CAB,* 121 U.S.App.D.C. 332, 350 F.2d 462 (1965).

16. *American Public Gas Ass'n, et al. v. Federal Energy Regulatory Comm.,* No. 75–2105, 10 May 1978, holding that § 4(b) of the Natural Gas Act, 15 U.S.C. § 717c(b), does not authorize the regulation of sales of natural gas in intrastate commerce, is distinguishable. That provision, like § 1374(b) of the Federal Aviation Act, note 4, *supra,* is limited by its terms to discriminatory practices in interstate commerce. However, a comparison of the legislative histories of the two statutes shows that the committees of Congress considered and rejected a limitation to the Federal Aviation Act which would have prohibited the Commission from exercising power over interstate rates. (Hearings before Subcommittee of the Committee on Interstate Commerce, U.S. Senate, 75th Cong., 1st Sess., 1937, on S. 2, pp. 519–20; Hearings before Committee on Inter-

state and Foreign Commerce, House of Repr., 75th Cong., 1st Sess., H.R. 5234 & H.R. 4652, p. 405.) The intent of Congress during consideration of the Natural Gas Act was clearly shown to be that of not disturbing the then existing jurisdiction of the states. (House Rept. 709, H.R. 6586, 75th Cong., 1st Sess., pp. 1–2.)

17. Recognition was made in the Initial Decision of the Administrative Law Judge of the existence of fare differentials in the intrastate monopoly markets where no effective competition was present, a differential which was caused either by a direct order from CPUC or because after the Board had approved a carrier's interstate tariff, approval of the intrastate fare had to be obtained from CPUC. (I.D. 29).

While the Board opinion does not mention consideration of the monopoly market situation, this was developed in the Initial Decision, which was adopted by the Board subject to the sole exception of inconsistency with a finding of unjust discrimination. In summation, the Board knew and considered the effects of charging higher interstate fares on intrastate monopoly routes.

18. We were informed at oral argument that the lower intrastate fare had been filed by all carriers on all competitive routes.

established in the *Domestic Passenger Fare Investigation* (DPFI). The *DPFI* principles set a rate-cost ratio which all interstate carriers have been required to apply nationwide. This was done in a very extensive rate proceeding to accomplish the objectives of (1) permitting the carrier to obtain a fair return on investment and (2) insuring that the cost of uneconomic operations are borne by the carrier and not by the passenger. The resulting fares are neither unreasonably high nor uneconomically low, and since the ratio is applied equally, no passenger is subsidizing another passenger in another market.

Neither the Federal Aviation Act nor court decisions require an individual rate inquiry in each investigative proceeding. The *Shreveport* decision affirmed the power of Congress, here delegated to the Board, to maintain its own standard on rates.

It was logical, therefore, for the Board to rely on the *DPFI* principle for setting fares in these proceedings as being fully within its authority.

Petitioners and the amicus curiae have labeled as locality discrimination the application of interstate fares in the monopoly markets which serve isolated parts of California. The interstate fares to be charged in the monopoly markets will correspond to the nationwide fare scheme, treating all passengers equally. When consideration is given to the nationwide equality in the fare structure, the argument lacks force.[19]

The Board's order permitting interstate carriers, as an exception to nationwide equality, to reduce fares on competitive routes in Texas and California follows established precedent, since competition has long been recognized as a justification for reducing fares.[20]

19. We note that Hughes Airwest receives a subsidy of approximately $9 million per year for serving the isolated communities of California. Hughes Airwest brief, p. 37. Obviously if Hughes Airwest is permitted to charge the higher interstate rate, the federal subsidy will be lessened.

## CONCLUSION

We find that the Board's decision was rational and based upon substantial evidence. The Civil Aeronautics Board is empowered by Congress to preempt state regulatory agencies in interstate commerce and accordingly the decision of the Board is

*Affirmed.*

20. *See, e. g., Barringer & Co. v. United States,* 319 U.S. 1, 13, 63 S.Ct. 967, 87 L.Ed. 1171 (1943); *Texas & Pacific Ry. Co. v. United States,* 289 U.S. 627, 636–37, 53 S.Ct. 768, 77 L.Ed. 1410 (1933); *United States v. Chicago Heights Trucking Co.,* 310 U.S. 344, 352–53, 60 S.Ct. 931, 84 L.Ed. 1243 (1940); *Board of Trade v. United States,* 314 U.S. 534, 546, 62 S.Ct. 366, 86 L.Ed. 432 (1942).